# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | |
| Plaintiff, | No. 13-CV-1030-LRR |
| vs. | **ORDER** |
| JAMES E. ONSAGER and ALFRED J. WITTINE, | |
| Defendants. | |
| ---------------------------------------------------- | |
| JAMES E. ONSAGER, | |
| Cross claimant, | |
| vs. | |
| ALFRED J. WITTINE, | |
| Cross defendant. | |
| ---------------------------------------------------- | |
| JAMES E. ONSAGER, | |
| Counter claimant, | |
| vs. | |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, | |
| Counter defendant. | |
| ---------------------------------------------------- | |
| ALFRED J. WITTINE, | |
| Counter claimant, | |
| vs. | |

LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

    Counter defendant.

_____

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *2* |
| II. | RELEVANT PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . | *2* |
| III. | FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *4* |
| | A.  *Parties.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *4* |
| | B.  *Overview of the Dispute.* . . . . . . . . . . . . . . . . . . . . . . . . . | *4* |
| IV. | ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *7* |
| | A.  *Mistake.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *8* |
| |     1.    *Applicable Law.*. . . . . . . . . . . . . . . . . . . . . . . . . . | *8* |
| |     2.    *Application.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *9* |
| | B.  *Scrivener's Error.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *14* |
| | C.  *Unjust Enrichment.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *16* |
| V. | CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | *17* |

## I. INTRODUCTION

This matter is before the court following a bench trial on Defendant, Cross Claimant and Counter Claimant James E. Onsager and Defendant and Counter Claimant Alfred J. Wittine's claims to the proceeds of an annuity policy. For the reasons explained below, the court concludes that Wittine is entitled to the proceeds of the annuity policy.

## II. RELEVANT PROCEDURAL HISTORY

On October 2, 2013, Lincoln National Life Insurance Company ("Lincoln National") filed a Complaint (docket no. 2). Lincoln National stated that "[t]his is an action for interpleader under Federal Rule of Civil Procedure 22, and for related declaratory and injunctive relief, regarding competing claims to the death benefit of an annuity contract issued by Lincoln." Complaint ¶ 1. On November 11, 2013, Onsager

filed an "Answer, Counterclaim and Cross Claim" ("Onsager Answer") (docket no. 9). On December 2, 2013, Lincoln National filed an "Answer to Counterclaim" ("Lincoln National Answer") (docket no. 12). On December 9, 2013, Wittine filed an "Answer to Complaint, Answer to Onsager's Cross-Claim, Counterclaim and Cross-Claim" ("Wittine Answer") (docket no. 13). On December 17, 2013, Lincoln National filed an "Answer to Counterclaim of Defendant Wittine" ("Lincoln National Second Answer") (docket no. 14). On December 18, 2013, Onsager filed an "Answer to Cross Claim" ("Onsager Second Answer") (docket no. 15). On September 10, 2014, Lincoln National filed a "Stipulation for Order to Deposit Funds and for Discharge" (docket no. 19). On September 24, 2014, the court ordered Lincoln National to deposit $632,122.02 "with the Clerk for placement in an interest-bearing account pending a final order directing distribution to the Defendants as their interests are determined by the court. . . . Upon the Clerk's receipt of such funds, Lincoln National shall be wholly and completely discharged and absolved from any further liability." September 24, 2014 Order (docket no. 22) at 3. On September 29, 2014, Lincoln National deposited $632,122.02 with the Clerk and the claims against Lincoln National were dismissed pursuant to the court's September 24, 2014 Order.

On March 5, 2015, the court ruled that as a result of Wittine's failure to comply with the Trial Management Order (docket no. 17), Wittine would not be allowed to present exhibits or documents, that he would only be permitted to call one witness and that the facts as set forth in the proposed final pretrial order were deemed true and correct.[1] *See* March 5, 2015 Order on the Final Pretrial Conference ("Order on FPTC") (docket no.

---

[1] Counsel for Wittine indicated that they had no additional exhibits or witnesses, aside from Alfred Wittine, and did not object to the contents of the facts as set forth in the proposed final pretrial order.

28). Additionally, counsel for Wittine was held in contempt.[2] March 5, 2015 Contempt Order (docket no. 30). On April 9, 2015, the court held a bench trial. *See* April 9, 2015 Minute Entry (docket no. 44). On April 21, 2015, Onsager filed a post-trial brief. *See* Onsager Brief (docket no. 45). On April 21, 2015, Wittine filed a post-trial brief. *See* Wittine Brief (docket no. 46).

### III. FACTUAL BACKGROUND

The Final Pretrial Order (docket no. 34) contains a stipulation of facts. *See* Final Pretrial Order at 2-4. However, Wittine did not participate in the preparation of the proposed final pretrial order and, therefore, did not agree to stipulate to the facts as presented by Onsager. As a consequence for failing to participate in pretrial preparations as directed by the Trial Management Order, the court ruled that the proposed stipulated facts would be accepted as true and considered by the court in deciding the case. *See* Order on FPTC; Final Pretrial Order (docket no. 34) at 2-4. In light of that ruling, the facts are as follows:

#### A. Parties

Lincoln National is an Indiana corporation with its principal place of business in Pennsylvania. At all times material to this claim, Lincoln National has been authorized to engage in the business of insurance in the state of Iowa. Onsager is a citizen and resident of Iowa. Wittine is also a citizen and resident of Iowa.

#### B. Overview of the Dispute

The dispute in this case arises over the proceeds of an annuity purchased by Ambrose Hoeger. Both Wittine and Onsager had personal relationships with Hoeger. Wittine and his wife, Marian, were close friends with Hoeger and Hoeger's wife, Dorothy, for more than twenty years. Wittine testified that he thought of Hoeger like a father and

---

[2] The court did not impose a monetary sanction on counsel for Wittine. *See* March 5, 2015 Contempt Order at 4.

4

Wittine's children treated the Hoegers as grandparents. The Wittines and Hoegers had weekly dinners and traveled together. By 2006, however, Wittine was spending more time outside the state of Iowa and did not see Hoeger as often. In 2002, Onsager met Hoeger when Onsager's mother began attending an adult daycare at which Hoeger volunteered. As Hoeger's health declined, Onsager became a caretaker for Hoeger and the two became close friends.

On April 8, 1993, Lincoln National issued a Flexible Premium Deferred Variable Annuity ("Annuity") to Hoeger. Hoeger was the owner and annuitant of the Annuity. Hoeger's wife, Dorothy, was originally listed as the beneficiary of the Annuity. On November 8, 2001, Hoeger changed the beneficiary to Stonehill Benevolent Foundation. On January 7, 2003, Hoeger changed the beneficiary to Divine Word College. On February 23, 2004, Hoeger changed the beneficiary to include multiple beneficiaries, designating fifty percent to Divine Word College and fifty percent to Alfred and Marian Wittine. On May 5, 2006, Hoeger executed a Change of Ownership and of Beneficiary, designating Onsager as a joint owner of the Annuity. *See* Trial Ex. 24. On the Change of Ownership and Beneficiary form, Alfred Wittine is listed as the sole beneficiary. *See id*. at 2. On May 23, 2006, Lincoln National sent Hoeger and Onsager a Beneficiary Acknowledgment form, which states that Wittine was the primary beneficiary of the Annuity. The Beneficiary Acknowledgment form directs Onsager and Hoeger to return the form if any corrections are needed. On May 23, 2006, Hoeger made changes to his will and trust. He made Onsager the executor of his will, with Wittine to serve as the executor in the event that Onsager could not. May 23, 2006 Will Ambrose A. Hoeger, Trial Ex. 7 at 2. Hoeger changed his trust to provide that $40,000 of the principal amount would go to Wittine, with the balance designated for Onsager. May 23, 2006 Amended Trust Agreement Ambrose A. Hoeger, Trial Ex. 9 at 2. In the event that Hoeger survived Onsager, the balance of the trust would pass to Wittine. *Id*. On January 25, 2008, Hoeger

5

made additional changes to his will and trust that excluded Wittine, but did not change his beneficiary designation for the Annuity. *See* Codicil to Law Will and Testament of Ambrose A. Hoeger, Trial Ex. 8; First Amendment to Amended and Restated Declaration of Trust, Trial Ex. 10.

On September 17, 2011, Hoeger passed away. Upon his death, Onsager filed a claim with Lincoln National for the proceeds of the Annuity. On October 25, 2012, Lincoln National sent a letter to Onsager and Wittine informing them that under the terms of the Annuity, the proceeds would be paid to the listed beneficiary, Wittine. Lincoln National stated that it was aware of Onsager's competing claim for the proceeds and could commence court proceedings to determine the rightful owner if the parties were unable to resolve the issue.

As established at trial, the competing claims for the Annuity proceeds arose as a result of a meeting that took place on May 5, 2006 between Hoeger, Onsager and Bart Timmerman, a Wells Fargo financial advisor who had worked with Hoeger since 2004. At that meeting, Hoeger expressed his desire to name Onsager a joint owner of the Annuity. Timmerman testified that he filled out the Change of Ownership form. *See id.* The first page contains Hoeger and Onsager's information. The third page of the Change of Ownership form contains Hoeger, Onsager and Timmerman's signatures. *See id.* at 3. On the second page of the Change of Ownership form, Wittine is listed in the beneficiary designation section. *Id.* at 2. At trial, Onsager testified that he had no recollection of seeing Wittine's name on the second page, and Timmerman testified that he did not write Wittine's name on the policy. Both Onsager and Timmerman testified that listing Wittine as the beneficiary was not discussed at the meeting.

Onsager and Wittine dispute whether Hoeger intended to make Wittine the beneficiary of the Annuity. Onsager claims that Hoeger intended for the Annuity proceeds to pass to Onsager in the event of Hoeger's death. Timmerman testified that Hoeger

wanted the Annuity proceeds to go to Onsager and that is the reason Hoeger made Onsager a joint owner. Timmerman believed that in the event of Hoeger's death, the Annuity would pass to Onsager regardless of whether there was a listed beneficiary because Onsager was a joint owner. Timmerman testified that at the May 5, 2006 meeting, he advised Hoeger that listing Onsager as a joint owner would result in Onsager retaining the Annuity. However, the language of the Annuity clearly contradicts that interpretation.

The Annuity provides in several different places that the proceeds will be paid to the beneficiary upon the death of the annuitant. Article 2 of the Annuity states that "[on] receipt of due proof of death of the Annuitant before a choice is made to receive proceeds under an Annuity Payment Option, [Lincoln National] will pay to the Beneficiary a Death Benefit . . . ." Annuity at 9. Article 3 of the Annuity specifies that "[t]he Beneficiary for this Contract will receive proceeds on the death of the Annuitant." *Id.* at 10. Additionally, a rider attached to the Annuity states that the annuity will be paid out as follows: "Upon the death of a non-annuitant owner, the proceeds shall be paid to any surviving joint or contingent owner. . . . If the decedent owner or joint owner is also the annuitant, then the death will be treated as death of the annuitant subject to the provisions of this Contract regarding death of the annuitant." *Id.* at 17. Therefore, the terms of the Annuity require the proceeds of the Annuity to be paid to the beneficiary when the annuitant dies. The existence of a joint owner is irrelevant. Here, Hoeger was the owner and annuitant, while Onsager was a non-annuitant owner and Wittine was the beneficiary.

## IV. ANALYSIS

Onsager argues that the court can reform the Annuity based on mistake and because there was a scrivener's error. He also argues that the court should reform the Annuity because Wittine's recovery of the proceeds would amount to unjust enrichment. Wittine argues that the court cannot reform the Annuity because there was no mutual mistake and, therefore, the court should uphold the terms of the Annuity and award him the proceeds.

7

The court will first consider whether it can reform the contract based on mistake. Next, the court will consider whether it can reform the contract based on a scrivener's error. Finally, the court will consider the issue of unjust enrichment.

### A.  *Mistake*

Onsager argues that the court should reform the Annuity because there was "a mistake in expression caused by a mistake in an underlying assumption." Onsager Brief at 10. Wittine argues that the court cannot reform the Annuity because there was, at most, a unilateral mistake "which is not ordinarily grounds for reformation." Wittine Brief at 4. Wittine also argues that the court may not consider extrinsic evidence of Hoeger's intent because the language of the contract is "plain, certain, and unambiguous." *Id*. at 5.

#### 1.  *Applicable law*

"Iowa law permits reformation of a written agreement that fails to reflect the 'true agreement' between the parties." *Peak v. Adams*, 799 N.W.2d 535, 545 (Iowa 2011). Before a court can reform a contract, there must be "a definite intention or agreement on which the minds of the parties had met" that "preexisted the instrument in question." *Id*. A court cannot reform a contract unless there was "a preliminary or prior agreement, either written or verbal, between the parties, furnishing the basis for rectification or to which the instrument can be conformed." *Id.* (quoting 66 Am.Jur.2d Reformation of Instruments § 4, at 529 (1973)). "Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 571 (Iowa 2004) (quoting Restatement (Second) of Contracts § 155) (internal quotation marks omitted).

8

"A mistake is a belief that is not in accord with the facts." *Id.* at 570 (quoting Restatement (Second) of Contracts § 151 (1981)) (internal quotation marks omitted).

> Mistakes involving contracts "can be made in the formation, integration, or performance of a contract." *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 437 (Iowa 1984). Mistake in expression, or integration, occurs when the parties reach an agreement but fail to accurately express it in writing. Mistakes in the formation of contracts include mistakes in an underlying assumption concerning matters relevant to the decision to enter into a contract. In this category of mistake, the agreement was reached and expressed correctly, yet based on a false assumption.

*State, Dept. of Human Servs.* ex rel. *Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001) (internal citations omitted); *see also Nichols*, 687 N.W.2d at 570. "The nature of the mistake in expression, or those instances where mistake in assumption relates to expression, is . . . compatible with the concept of reformation. When the understanding of the parties was not correctly expressed in the written contract, equity exists to reform the contract to properly express the intent of the parties." *Unisys*, 637 N.W.2d at 151 (internal citations omitted). However, "a unilateral mistake by one party will not release that party from its obligation under the contract absent fraud, misrepresentation, or other misconduct." *Id.* at 150.[3]

### 2. *Application*

Onsager argues that the court should reform the Annuity and award the proceeds to him because there was a "mistake in expression caused by a mistake in an underlying

---

[3] The court recognizes that the Annuity differs slightly from a typical contractual agreement. However, the parties have not pointed to any authority suggesting that annuity contracts are treated differently with regard to the doctrine of mistake and the court has found none. *See e.g.*, *Poulos v. Weatherwax*, 2007 WL 4463973, at *5 (Mich. Ct. App. Dec. 20, 2007) (unpublished decision) (finding that an annuity could not be reformed in the absence of mutual mistake under Michigan law).

9

assumption." Onsager Brief at 10. This mistake resulted in Onsager being listed as a joint owner of the Annuity, despite Hoeger's alleged intent to ensure that Onsager would control the Annuity after Hoeger's death. *Id*. Wittine argues that there was not a mutual mistake and, therefore, the court cannot reform the Annuity. Wittine Brief at 4-5.

The parties to the Annuity are Lincoln National and Hoeger. Onsager's argument that the court can reform the contract based on a unilateral mistake is unsupported by Iowa law. Onsager cites *Unisys* for the proposition that reformation is available when the parties make "a mistake in a basic assumption" when entering a contract and that it makes no difference "whether the mistake was unilateral or mutual." Onsager Brief at 11 (citing *Unisys*, 637 N.W.2d at 151).

A mistake in an underlying assumption concerns "matters relevant to the decision to enter into a contract" and includes situations where "the agreement was reached and expressed correctly, yet based on a false assumption." *Unisys*, 637 N.W.2d at 151. This mistake can be corrected by a court even if it is a unilateral mistake because "the operative mistake is the belief of the parties that the contract correctly expresses the agreement." *Id*. The mistake at issue in *Unisys* was miscalculated capitation rates that "the parties intended . . . to accurately reflect the actual cost experience." *Id.* at 153. As a result, both parties believed that the contract contained rates reflecting the true cost, when in fact there had been a miscalculation resulting in incorrect rates—the mistake was mutual.

In stating that "it normally makes no difference if the mistake is mutual or unilateral," the Iowa Supreme Court relied on a treatise that described the doctrine of mistake in the context of "performance and related problems." *See id*. at 151 (citing George E. Palmer, *The Law of Restitution* § 14.4, at 157-58, 161 (1978 & Supp. 1984) ("An undifferentiated approach to problems of mistake sometimes leads courts to say that the mistake must be mutual in order to support restitution for mistake in performance. Whatever truth there may be in the statement as applied to relief for mistake in basic

assumptions, mutuality should not be necessary when a payment of money is due to a mistake in performance." (footnote omitted))). The treatise explains the nuances of mistake in a variety of different scenarios, including mistakes in expression and mistakes in performance. However, it does not support the theory that a court can always reform a contract regardless of whether the mistake is unilateral or mutual when there is a mistake in expression, a proposition contradicted by Iowa law.

Here, Lincoln National did not have a pre-existing belief that was mistakenly expressed in the Annuity. Rather, Timmerman mistakenly believed that if Hoeger made Onsager a joint owner of the Annuity, Onsager would receive the proceeds from the Annuity. Timmerman testified that Hoeger intended for Onsager to receive the proceeds of the Annuity and that Timmerman, Onsager and Hoeger thought that designating Onsager as a joint owner would effectuate that intent. Therefore, any mistake was between Hoeger and two non-contracting parties. As the Iowa Supreme Court made clear in *Peak v. Adams*, courts can only reform a contract when "a written agreement . . . fails to reflect the true agreement between the parties." *Peak*, 799 N.W.2d at 545 (internal quotation marks omitted). Additionally, *Unisys* states that "a unilateral mistake by one party will not release that party from its obligation under the contract absent fraud, misrepresentation, or other misconduct." *Unisys*, 637 N.W.2d at 150. Despite Onsager's contentions, he has failed to identify a mutual mistake in the instant action. Lincoln National sent a letter to Hoeger and Onsager confirming that Wittine was the designated beneficiary. There is no evidence suggesting that Lincoln National thought the proceeds would go to Onsager in the event of Hoeger's death. Instead, the terms of the Annuity are clear that in the event of Hoeger's death, the proceeds of the Annuity will be paid to Wittine. Therefore, due to the absence of a mutual mistake, the court is unable to reform the contract based on the argument that there was a mistake in an underlying assumption.

Moreover, even if the court had the power to reform the Annuity, it would not. The "party who seeks reformation, claiming a contract does not reflect the real agreement between the parties, has the burden of establishing this contention by clear, satisfactory, and convincing proof." *Bennett v. Susie*, 674 N.W.2d 684, 2003 WL 23219944, at *2 (Iowa Ct. App. Nov. 26, 2003). "Requiring a high standard of proof helps ensure that a court granting reformation is merely changing the terms of a written document to reflect the agreement of the parties and not making a new agreement for them." *Id*.

Here, both Onsager and Wittine presented evidence of their strong relationships with Hoeger. Both parties played a significant role in Hoeger's life and he, at various times, included both men in his will, trust and the Annuity. Onsager argues that by removing Wittine from his will and trust in 2008, Hoeger clearly wanted to ensure that Wittine received nothing upon Hoeger's death. However, any evidence of Hoeger's intent after May 5, 2006 is of little relevance, as the court may only consider evidence of the parties' intent prior to entering into the agreement. *See Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract."). Moreover, there are various reasons why someone might remove someone from a will or trust, including the fact that the person was provided for through other means—such as an annuity. Timmerman testified that Hoeger wanted Onsager to receive the proceeds of the Annuity. Although this is strong evidence, it does not explain the presence of Wittine's name on the Annuity as the sole beneficiary. Furthermore, it does not explain why neither Hoeger nor Onsager took steps to remove Wittine's name as the listed beneficiary of the Annuity upon receiving the Beneficiary Acknowledgment form from Lincoln National. Hoeger had changed beneficiaries on the Annuity in the past. However, Hoeger never made someone a joint owner prior to designating Onsager the joint owner.

Although neither party presented evidence at trial about why Hoeger might have wanted to make Onsager a joint owner while keeping a named beneficiary on the Annuity, there are benefits to being a joint owner as opposed to a beneficiary. *See* Douglas Burdick Deposition, Court's Exhibit 1 at 11-12. A joint owner can make changes to an annuity, including changing the listed beneficiary or choosing to make withdrawals and begin receiving payments. *Id.* at 12, 15-20 (stating that a joint owner "shares in the rights of an owner, they can do anything that an owner can do . . ."). Therefore, it is plausible that Hoeger may have intended to make Onsager a joint owner so that he could control the Annuity even while Hoeger was still alive. This control gave Onsager the ability to make changes to the Annuity up until Hoeger's death. Onsager became a joint owner of the Annuity in May 2006. Hoeger passed away in September 2011. Until that point, Onsager was free to make changes to the Annuity, including changing the beneficiary or authorizing payments. The fact that Onsager did not exercise control as an owner may indicate a general misunderstanding as to the terms of the Annuity or the rights of a joint owner of an annuity, but it does not persuade the court that Hoeger intended for Wittine to be entirely removed from the Annuity.

Onsager also argues that Hoeger's changes to his will and trust show that Hoeger intended to exclude Wittine from his estate. However, the timing of the changes to Hoeger's will and trust does not support a finding that in May 2006 Hoeger wanted to completely exclude Wittine. Hoeger made changes to his will and trust on May 23, 2006.[4] *See* May 23, 2006 Will Ambrose A. Hoeger, Trial Ex. 7; May 23, 2006 Amended Trust

---

[4] Hoeger made subsequent changes to his will and trust in 2008 and removed Wittine. *See* January 25, 2008 First Codicil to Will of Ambrose A. Hoeger, Trial Ex. 8; January 25, 2008 First Amendment to Trust Agreement of Ambrose A. Hoeger, Trial Ex. 10. However, the court sees little relevance in the changes Hoeger made in 2008, nearly two years after Hoeger changed his will, trust and Annuity in 2006. Furthermore, the Annuity itself was not changed after May of 2006.

13

Agreement Ambrose A. Hoeger, Trial Ex. 9. Onsager and Hoeger executed the Annuity Change of Ownership form on May 5, 2006, making Onsager a joint owner of the Annuity. Change of Ownership, Trial Ex. 24. Lincoln National sent the Beneficiary Acknowledgment on May 23, 2006, confirming with Hoeger and Onsager that Wittine was the listed beneficiary. Therefore, events taking place in May 2006 best represent Hoeger's intent with regard to his estate. On May 23, 2006, Hoeger designated Onsager as the executor of his will. However, he designated Wittine as the executor in the event Onsager was unwilling or unable to act as executor. *See* May 23, 2006 Will Ambrose A. Hoeger at 2. Also on May 23, 2006, Hoeger changed his trust to provide for $40,000 to go to Wittine and his wife and the balance of the trust to be paid to Onsager. Based on events that occurred in May 2006, it is evident that Hoeger did not intend to completely remove Wittine from his estate. If anything, Hoeger wanted Onsager to have control over certain aspects of his estate and to receive a portion of it upon Hoeger's death. In sum, the evidence does not rise to the required level of "clear and convincing" for the court to justify reformation of the Annuity.

### B. Scrivener's Error

Onsager argues that the court may reform the contract based on a unilateral mistake because the designation of Wittine as the beneficiary was a scrivener's error. *See* Onsager Brief at 10. "[T]he requirement of mutuality of mistake does not apply to a mistake of a scrivener in reducing an agreement to writing." *Koehn v. Koehn Bros. Farms, LLC*, 856 N.W.2d 3, 2014 WL 4230200, at *11 (Iowa Ct. App. Aug. 27, 2014) (unpublished table decision) (quoting *Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct. App. 1998)) (internal quotation marks omitted) (alteration in original). "[A] scrivener's error presents a narrow and demanding exception to the general rule that a court is not permitted to rewrite a document or add terms not included by the parties." *Tiger Fibers, LLC v. Aspen Specialty Ins. Co.*, 594 F. Supp. 2d 630, 641 (E.D. Va. 2009) (applying Virginia law, but

14

noting that it is a generally accepted principle). A scrivener's error is defined as "[a]n error resulting from a minor mistake or inadvertence, [especially] in writing or copying something on the record, and not from judicial reasoning or determination." Black's Law Dictionary, 7th ed. at 562 (stating the definition for "clerical error," under which scrivener's error is included as a related term). These types of errors include typing incorrect numbers or misspelling words. *Id.*

Onsager alleges that designating Wittine as a beneficiary was a mere scrivener's error. However, the testimony at trial does not support that contention. Rather, the testimony supports only the contention that no one is sure what happened with respect to the beneficiary designation. Timmerman testified that he did not write in the beneficiary designation and states that the parties at the May 5, 2006 meeting intended for the beneficiary designation to be left blank. Onsager testified that he had no recollection of the beneficiary designation being discussed during the May 5, 2006 meeting when he was added as a joint owner to the Annuity. Onsager argues that based on this evidence, the court should treat the existence of the beneficiary designation as a mere scrivener's error and reform the Annuity.

The purported error, however, is not a scrivener's error. *See, e.g.*, *Jongma v. Grand Pork, Inc.*, 776 N.W.2d 886, 2009 WL 3381518, at *5 (Iowa Ct. App. Oct. 21, 2009) (unpublished table decision) (noting that a warranty deed reserving rights for "the grantees" was clearly a scrivener's error based on the terms in the deed). A mere scrivener's error here would be akin to spelling a party's name wrong, or writing the wrong date. A scrivener's error does not explain how someone whose name was supposedly neither discussed at the May 5, 2006 meeting nor meant to be listed on the Annuity came to occupy the sole beneficiary position in the Annuity.

Even assuming that the parties mistakenly designated Wittine as a beneficiary at the May 5, 2006 meeting, the fact remains that Lincoln National sent beneficiary designation

confirmation letters to both Hoeger and Onsager in the weeks following the May 5, 2006 meeting. The beneficiary designation confirmation letters state that Wittine is the designated beneficiary for the Annuity and direct Hoeger or Onsager to respond to Lincoln National if the beneficiary designation is incorrect. *See* Trial Exhibit 29. The court finds that this evidence does not support finding that the beneficiary designation was a mere scrivener's error. Accordingly, the court cannot reform the Annuity based on the argument that Wittine's inclusion as the sole beneficiary of the Annuity was due to a unilateral mistake constituting a scrivener's error.

### C. Unjust Enrichment

Onsager argues that awarding the Annuity proceeds to Wittine "would amount to an unjust enrichment and windfall to Wittine." Onsager Brief at 15. "The doctrine of unjust enrichment is based on the principle that a party should not be permitted to be unjustly enriched at the expense of another." *Unisys*, 637 N.W.2d at 154. "It . . . may serve as an independent ground for restitution in the absence of mistake, wrongdoing, or breach of contract." *Stukas v. Muller*, 699 N.W.2d 685, No. 04-1230, at *1 (Iowa Ct. App. May 25, 2008) (unpublished table decision). The elements of recovery for unjust enrichment are: "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under these circumstances." *Unisys*, 637 N.W.2d at 154-55. The doctrine of unjust enrichment is not limited to benefits "conferred directly by the plaintiff . . . . The critical inquiry is that the benefit received be at the expense of the plaintiff." *Id.* at 155. However, "[g]enerally the existence of a contract precludes the application of the doctrine of unjust enrichment." *Johnson v. Dodgen*, 451 N.W.2d 168, 175 (Iowa 1990); *see also Smith v. Harrison*, 325 N.W.2d 92, 94 (Iowa 1982) (stating that any benefits received by a party pursuant to a contract cannot be unjust enrichment unless there first exist grounds for setting aside the contract); *Brinkmann v. St. Paul Fire & Marine Ins. Co.*, 723 N.W.2d

449, 2006 WL 1750491, at *2 (Iowa Ct. App. June 28, 2006) (unpublished table decision) (finding that "there can be no recovery under a claim of unjust enrichment" when a contract governs the parties' relationship).

Onsager argues that allowing Wittine to receive the proceeds from the Annuity would amount to unjust enrichment. The parties do not dispute that Wittine was listed as the beneficiary of the Annuity. Under the express terms of the Annuity, the proceeds will be paid to the beneficiary upon death of the annuitant. *See* Trial Ex. 26 at 17. Onsager has failed to demonstrate grounds for the court to set aside the Annuity. Therefore, unjust enrichment is inapplicable and Onsager's claim necessarily fails.

## *V. CONCLUSION*

In light of the foregoing, the court finds in favor of Alfred Wittine. The Clerk of Court is **DIRECTED** to enter judgment for Alfred Wittine and against James Onsager. The Clerk of Court is also **DIRECTED** to release the funds to Wittine within fourteen days of the date of this Order.

**IT IS SO ORDERED.**

**DATED** this 26th day of June, 2015.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA